# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.

NANCY MORENO-MAGANA (01), and
VICTOR MARTINEZ (02),

        Defendants.

Case No. 15-cr-40058-DDC

## MEMORANDUM AND ORDER

This matter comes before the Court on three motions filed by defendants Nancy Moreno-Magana and Victor Martinez.  On October 14, 2015, Mr. Martinez filed a Motion to Suppress GPS Location Information Seized By Government Agents From Defendant's Cell Phone Without First Obtaining A Warrant (Doc. 33).  That same day, Ms. Moreno-Magana filed a similar Motion to Suppress Evidence (Doc. 34).  Mr. Martinez also has filed a motion (Doc. 55) asking the Court to strike the government's supplemental response (Doc. 54) to his motion to suppress.

In their suppression motions, defendants contend that the Kansas Bureau of Investigation ("KBI") conducted an illegal search of their cell phones by tracking the GPS locations of those phones before receiving (or without using) a warrant or court order.  Defendants contend that the Court must suppress all evidence, including 2,653.3 grams of methamphetamine, seized by law enforcement, because the KBI searched data on their phones without "relying on a warrant," *see* Doc. 33 at 19, or qualifying under a valid exception to the Fourth Amendment's warrant requirement.  The government has filed a response opposing defendants' suppression motions

(Doc. 45). The Court conducted evidentiary hearings on the motions on November 16 and

November 24, 2015. For the reasons explained below, the Court grants Mr. Martinez's motion

to strike but denies both defendants' motions to suppress.

## I.    Defendant Martinez's Motion to Strike Document 54

Before reaching defendants' motions to suppress, the Court, first, must address defendant

Martinez's Motion to Strike (Doc. 55) the government's "Supplemental Response on Issue of

Standing Pertaining to Defendant Victor Martinez." On November 12, 2015, the government

filed its "Supplemental Response" (Doc. 54) without requesting leave of court. In it, the

government advances a new argument against suppression not included in its initial Response

(Doc. 45). Mr. Martinez asks the Court to strike the "Supplemental Response" because, he

contends, it actually is a sur-reply which the government filed without leave of court and outside

the time afforded by D. Kan. Rule 6.1(a).

However categorized, the Court finds that the government's "Supplemental Response" is

improper. Generally, briefing on motions in our District is limited to the initial motion

(including a memorandum in support), a responsive brief or memorandum, and a reply brief or

memorandum. Supplemental papers and "[s]urreplies typically are not allowed." *COPE v. Kan.*

*State Bd. of Educ.*, 71 F. Supp. 3d 1233, 1238 (D. Kan. 2014) (citing *Taylor v. Sebelius*, 350 F.

Supp. 2d 888, 900 (D. Kan. 2004)). Courts may permit additional briefing "in rare cases, but not

without leave of court." *Taylor*, 350 F. Supp. 2d at 900 (citing *Humphries v. Williams Nat. Gas*

*Co.*, No. 96-4196-SAC, 1998 WL 982903, at *1 (D. Kan. Sept. 23, 1998)).

Here, the government never asked for leave; it simply filed its "Supplement Response."

This supplement also advances an entirely new argument that was available to the government

when it filed its Response. *See Chris-Leef Gen. Agency, Inc. v. Rising Star Ins., Inc.*, No. 11-cv-

2409-JAR, 2011 WL 5039141, *1 (D. Kan. Oct. 24, 2011) (stating that parties "cannot use a surreply to add additional arguments to supplement the incomplete research of their response"); *Myers v. Knight Protective Serv., Inc.*, No. CIV-10-866-C, 2012 WL 123120, at *4 n.4 (W.D. Okla. Jan. 17, 2012) (finding a supplemental response improper because it was not responsive to any new argument or law raised in the opposing party's Reply). For these reasons, the Court grants Mr. Martinez's Motion to Strike Document 54.[1]

## II.     Defendants' Motions to Suppress

### A.  Background and Controlling Facts

The government has charged both defendants with conspiring to possess methamphetamine with intent to distribute and actual possession of methamphetamine with intent to distribute it. *See* Doc. 1.

### *Information Received From a Confidential Informant*

In September 2014, a confidential informant ("CI") who had provided reliable information to law enforcement during many federal and state investigations, contacted KBI Special Agent Nick Pipkin. The CI told Agent Pipkin that a man known as "Guerro" planned to transport a shipment of methamphetamine from Los Angeles, California, to Topeka and Wichita, Kansas.

On November 11, 2014, the CI received text messages from Guerro. In those messages, Guerro informed the CI that he and his accomplices were driving a load of methamphetamine to Kansas. The messages informed the CI that Guerro was driving the lead car—a gray Toyota Solara with a black top and California license plates. Also, the messages informed the CI that a separate "load vehicle"—a gray Ford Ranger with California plates—contained the

---

[1]     Even if it considered the argument advanced in the government's "Supplemental Response," the Court would reach the same result on Mr. Martinez's motion to suppress.

methamphetamine.  The CI shared Guerro's text messages with Agent Pipkin.  Acting on the CI's information, KBI agents located and stopped Guerro's vehicle in western Kansas.  Agents found no methamphetamine in Guerro's car, however, and they never found the vehicle purportedly transporting methamphetamine.  The CI later told Agent Pipkin that the other vehicle had diverted to an unknown location after law enforcement had intercepted Guerro.

Four months later, in February 2015, Guerro contacted the CI again.  This time, Guerro told the CI that a white Chevrolet Trailblazer was on its way from Los Angeles to Topeka and that it contained a shipment of methamphetamine.  Guerro also informed the CI that his sister-in-law was driving the white Trailblazer.  That same day, Guerro's sister-in-law contacted the CI from wireless phone number (661) 772-3131 ("Phone 3131").  The sister-in-law indicated that she and her male passenger were driving to Topeka.  She informed the CI that her passenger's phone number was (661) 447-8316 ("Phone 8316").  The CI shared this information with Agent Pipkin.

### State Court Authorization of GPS Location Tracking

Agent Pipkin appeared before a Kansas state District Court Judge in Shawnee County, Kansas at 4:00 p.m. on Saturday, February 21.  Agent Pipkin presented the judge with an application for two warrants authorizing the KBI to ping the GPS locators for Phone 3131 and Phone 8316 and thus track the real-time location of the cell phones carried by Guerro's sister-in-law and her passenger.[2]  Agent Pipkin's application contained the background information, as outlined above, reported that the CI's information was reliable but unverified, and stated that the KBI sought the warrants to "interdict the load of [m]ethamphetamine before it arrive[d] in

---

[2]     A wireless service provider "pings" the GPS location of a cell phone by sending an electronic signal to the phone directing it "to compute its current GPS coordinates and communicate that data back to the provider."  *In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 531 (D. Md. 2011).  The wireless provider then forwards the phone's geographic coordinates to law enforcement.  *Id.*

Topeka, KS." Doc. 45-1 at 3. The application also described the KBI's concern for the CI and the CI's family, stating, in relevant part:

> It is believed that "Guerro" is connected to the Sinaloa Cartel out of Mexico and the propensity for violence is very high. For the safety of the CI and the CI's family[,] it is imperative that the load does not make it to Topeka. A ping order on both of these phones would greatly improve the chances that the load is found prior to arriving in Topeka thus preventing the CI from risk of death or serious harm.

*Id.* During his testimony at the evidentiary hearings on defendants' motions, Agent Pipkin explained that the KBI believed the CI and the CI's family were in danger because the KBI did not have the resources to pay for the large shipment of methamphetamine reportedly en route to Topeka.

At 4:07 p.m. on Saturday, February 21, the state court judge signed a warrant authorizing the KBI to track the location of Phone 3131. *See id.* at 4. The judge also signed a second warrant authorizing tracking of Phone 8316 at 4:11 p.m. that same day. *See id.* at 5. Both the judge and Agent Pipkin signed the application at 4:11 p.m. *See id.* at 3.

At 4:30 p.m., about 20 minutes after receiving the signed warrants, Agent Pipkin sent a fax to T-Mobile's Law Enforcement Relations Group requesting real-time GPS location data for Phone 3131 and Phone 8316. For unexplained reasons, Agent Pipkin did not include the signed warrants in his fax to T-Mobile. But, in the comments section of the fax cover sheet, he wrote: "EXIGENT CIRCUMSTANCES. NEEDS TO BE TURNED ON ASAP." Doc. 45-2 at 2. During discovery, defense counsel asked the government for a copy of the warrant application that Agent Pipkin had presented to the state court judge. The government disclosed a copy of the application and otherwise responded to the request: "SA Pipkin didn't use the [ping] order, because of the exigent circumstances, thus that order is irrelevant." Doc. 35-1.

During the hearings on defendants' motions, Agent Pipkin testified that he had faxed copies of the warrants to T-Mobile and had spoken with a T-Mobile representative before faxing his request to initiate pinging because of exigent circumstances.  Specifically, Agent Pipkin testified:

> Q.      Okay.  Now, simultaneously with you contacting T-Mobile[,] a warrant is obtained from a state district court judge, correct?
>
> A.      Yes.
>
> . . . .
>
> Q.      Okay.  Why do both?
>
> A.      Past practice and what I was told, because I have not done many pings in my career, is that you need an affidavit for that[,] signed by a judge.  So[,] I went ahead and did that.  It was on a weekend. . . .  I eventually got ahold of T-Mobile to actually speak to a person. . . .  I gave them what I had.  I had said, I have an affidavit.  They then asked me a couple other questions and the exigency came up. I then explained what I had.  The individual [at T-Mobile] I was then speaking with said, well, that is exigent circumstances.  You don't need an affidavit for exigent circumstances.  We can just turn it on immediately.  And I said, that's great.  I had already faxed the affidavit prior to that.
>
> Q.      To who?
>
> A.      To T-Mobile.
>
> Q.      Okay.  So the warrant was in existence and served but there's no return on it.  Why is that?  You never did a return of service on that warrant even though you faxed it to T-Mobile?
>
> A.      I can't answer that.  Don't know.

Doc. 58 at 139-41.  Agent Pipkin also testified that the T-Mobile representative had explained that the wireless carrier's legal department was not available to review his warrants because it was the weekend.  *See* Doc. 60 at 242-43.  According to Agent Pipkin, the T-Mobile representative informed him that, absent exigent circumstances, T-Mobile could not ping the location of the requested phones until Monday.

*Law Enforcement's Tracking, Stop, and Search of Defendants*

Agent Pipkin received the first location alert from T-Mobile for Phone 3131 at 5:24 p.m. on Saturday, February 21.  This was about 90 minutes after the Kansas judge had signed the warrants.  This initial alert placed Phone 3131 on Interstate 70 west of Denver, Colorado.  T-Mobile continued to send Agent Pipkin location updates for Phone 3131 and Phone 8316 as both phones traveled east on I-70 from Colorado into Kansas.  Agent Pipkin testified that he used these alerts to locate Guerro's sister-in-law and her male passenger in a white Chevrolet Traverse traveling eastbound on I-70.[3]  Specifically, Agent Pipkin testified that he saw a white Chevrolet Traverse with California license plates pass his location on I-70 near Bunker Hill, in Russell County, Kansas.  Agent Pipkin noted the car's make, model, and license plate number and saw that an adult female and an adult male were the Traverse's only occupants.  Agent Pipkin confirmed that the woman driving and her passenger carried Phone 3131 and Phone 8316 by comparing the Traverse's location on I-70 with the location alerts provided by T-Mobile.

At 3:23 p.m. on Sunday, February 22, T-Mobile advised Agent Pipkin that Phone 8316 was located on I-70 approaching Solomon in Saline County, Kansas.  And, at 3:39 p.m., Agent Pipkin received another location alert indicating that Phone 3131 had passed Abilene and was nearing Chapman, Kansas—some 75 miles west of Topeka.

The KBI contacted the Geary County Sheriff's Department between 3:20 p.m. and 3:30 p.m. that Sunday afternoon.  The KBI advised the Sheriff that a white Chevrolet Traverse with California license plates was transporting a large load of methamphetamine through the county.  The KBI asked the department to intercept the car and conduct a traffic stop.  In turn, the Geary

---

[3]      The application that Agent Pipkin provided to the state court judge represented that Guerro had told the CI that the shipment of methamphetamine was in a white Chevrolet Trailblazer, not a white Chevrolet Traverse.  During the evidentiary hearings on defendants' motions, Agent Pipkin acknowledged this dissonance and testified that law enforcement was looking for a white Chevrolet SUV. *See* Doc. 58 at 147; Doc. 60 at 223.

County Sheriff dispatched its Lieutenant, Justin W. Stopper, and another officer, Christopher Ricard, to find and stop the Traverse.

At 3:48 p.m., Lt. Stopper accomplished the first objective, locating the white Traverse traveling eastbound on I-70 between Chapman and Junction City, Kansas. Lt. Stopper noted that snow and grime obscured the Traverse's front license plate, a violation of K.S.A. § 8-133. He also testified that he observed the Traverse following the car in front of it at an unsafe distance, a violation of K.S.A. § 8-1523(a). Lt. Stopper testified that he determined that the Traverse was following the car ahead of it too closely by selecting a single point on the Interstate Highway and counting to time the Traverse's following distance.[4] Lt. Stopper began counting when the lead car passed his selected point and stopped counting once the Traverse had reached that point. Lt. Stopper explained that he performed this manual calculation while traveling at highway speeds and going the opposite direction on the other side of the median dividing I-70. After recording the two traffic violations, Lt. Stopper turned his patrol car around, switched on his emergency lights, and stopped the Traverse on the eastbound portion of I-70 near Exit 295.

Lt. Stopper approached the Traverse from the passenger side. He made contact with the driver, who he identified as Ms. Moreno-Magana. While collecting Ms. Moreno-Magana's driver's license and car rental contract, Lt. Stopper became suspicious that defendants were

---

[4]     Lt. Stopper testified that he detected this traffic violation, as he termed it, by selecting a lane marker on the surface of the highway and, after the lead car passed the lane marker, counting aloud to determine how much time passed before defendants' Traverse reached this lane marker. Lt. Stopper testified that defendants' Traverse trailed the car in front of it by only 1.5 seconds, or half of the three seconds that represents a safe following distance. While the Court has concerns about the reliability of this calculation—performed by Lt. Stopper while driving in the opposite direction of a divided highway while traveling at highway speed—it need not address those concerns to decide the issues presented by these motions. *Cf.* Kansas Driving Handbook, Prepared by the Kansas Department of Revenue, Division of Vehicles, at 11 (2009), http://www.ksrevenue.org/pdf/dlhb.pdf (stating that K.S.A. § 8-1523 requires that a driver "not follow a vehicle more closely than what is 'reasonable and prudent'" and recommending that drivers "[u]se the *two second rule* for measuring a safe following distance under prime conditions") (emphasis added); *see also* Kansas Highway Patrol Facts and FAQs, http://www.kansashighwaypatrol.org/faqs/violations.html (last visited Feb. 2, 2016) ("For a safe following distance, use the *two-second rule*.") (emphasis added).

trafficking narcotics. Lt. Stopper noticed that both defendants acted unusually nervous. Lt. Stopper testified that both defendants were shaking and he said he could see Mr. Martinez's heart pounding through his clothes. Lt. Stopper also noted that the interior of the Traverse contained a suspiciously limited amount of luggage for two people traveling in a rented SUV. He also detected an unusually strong odor of air freshener coming from the Chevrolet. And while examining the rental contract for the Traverse, Lt. Stopper discovered that: (1) a third-person, Carol Moreno, had rented the car but was not present; (2) the car had traveled from Los Angeles, purportedly a frequent source of illegal drugs; and (3) the car was due back in Los Angeles the next day—only three days after Carol Moreno had rented it.

Lt. Stopper took Ms. Moreno-Magana's driver's license and rental contract and asked her to join him in his patrol car. As the two walked to the patrol car, Lt. Stopper gave Officer Ricard a "thumbs up," signaling, he testified, that he suspected the car contained illegal drugs and directing Officer Ricard to deploy his certified drug dog to perform a free air sniff around the Traverse. While Lt. Stopper sat with Ms. Moreno-Magana and checked her information with dispatch, the dog alerted to the presence of drugs in the Traverse.

After issuing Ms. Moreno-Magana a warning for following another car too closely, Lt. Stopper and Deputy Ricard placed Ms. Moreno-Magana and her passenger, who they identified as Mr. Martinez, in the back of separate patrol cars. Then the two officers began to search the Traverse. Their search located no contraband, however. So, they transported the car to the Geary County Sherriff's nearby warehouse and once there law enforcement officials conducted a more thorough search. During this second search, officers discovered three packages concealed in a cavity between the Traverse's headliner and roof. In total, the packages contained 2,653.3 grams of methamphetamine.

**B. Analysis**

Defendants contend that the Court must suppress all evidence derived from law enforcement's search of the GPS location data transmitted by defendants' cell phones.[5]  Both defendants contend that the government has violated their Fourth Amendment rights because it failed to secure or use warrants or court orders before tracking the location of their phones.  In addition, defendants contend that:  (1) the state court lacked probable cause to issue warrants; (2) the good faith exception set out in *United States v. Leon*, 468 U.S. 897 (1984) does not apply here; (3) exigent circumstances did not excuse the KBI's alleged failure to obtain or use warrants, as required by the Fourth Amendment and Kansas law; and (4) the independent source doctrine cannot prevent suppression of evidence seized based on the government's purportedly illegal pings.  Defendants also argue that the state court judge did not have jurisdiction to issue warrants while the two cell phones were located outside Kansas.  The Court addresses each of defendants' arguments, in turn, below.

> **1. Law enforcement satisfied Kansas law and the Fourth Amendment's warrant requirement before requesting pings of defendants' cell phones.**

Defendants contend, first, that law enforcement searched their cell phones illegally when it failed to secure or "use" warrants before tracking their GPS locations.  According to defendants, law enforcement's conduct violated both Kansas law and their Fourth Amendment rights.

---

[5]     The government's Response to defendants' motions states that it "assumes, but does not concede," that "a cell phone is a tracking device and that [defendants] have an expectation of privacy in the GPS locational data transmitted by their cell phones."  Doc. 45 at 8 n.1.  The Court, consistent with the consequences of the government's assumption, also "will assume without deciding that pinging [cellular location data] is a search."  *United States v. Barajas*, 710 F.3d 1102, 1108 (10th Cir. 2013) (finding the question whether a cell phone ping is a search "somewhat unsettled after the Supreme Court's decision in *United States v. Jones*, — U.S. —, 132 S. Ct. 945 (2012)").

The Fourth Amendment to our Constitution protects persons against unreasonable searches and seizures. U.S. Const. amend. IV. Generally, a search is *per se* unreasonable unless law enforcement secures a warrant based on probable cause. *See* U.S. Const. amend. IV; *Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions.") (internal quotation omitted).

Kansas law supplements these Constitutional protections by statute. K.S.A. § 22-2502 specifies requirements for search warrants issued by state court judges in Kansas. It provides that a magistrate may issue a warrant for the search or seizure of "any information concerning the user of an electronic communication service" and "any information concerning the location of electronic communications systems" only after law enforcement makes a showing of probable cause. K.S.A. § 22-2502(a)(1)(G)(i). Section 22-2502 also requires a magistrate to discern probable cause before issuing a search warrant permitting "the installation, maintenance and use of a tracking device." K.S.A. §22-2502(a)(2). These statutory requirements obviate, in this case, the question whether law enforcement had to secure warrants before it collected GPS information from defendants' cell phones. *See Jones*, 132 S. Ct. at 953-54 (holding that the Fourth Amendment requires a warrant before placing a GPS tracking device on a vehicle, but refusing to resolve whether a warrant is required in "[s]ituations involving merely the transmission of electronic signals without trespass").

### a. Law enforcement complied with Kansas law.

Defendants here argue that the government conducted a warrantless search of their location data and, in the process, used their cell phones as "tracking devices." Kansas law

defines a "tracking device" as:

> an electronic or mechanical device that permits a person to remotely determine or track the position or movement of a person or object. 'Tracking device' includes, but is not limited to, a device that stores geographic data for subsequent access or analysis and a device that allows for the real-time monitoring of movement.

K.S.A. § 22-2502(f)(4). Kansas courts have not decided whether a cell phone tracked in real-time by locational data supplied by a wireless provider to law enforcement is a "tracking device" for purposes of § 22-2502(f)(4). And the Court need not make that determination to decide the issues presented here.

The Court need not decide this question because the credible evidence demonstrates that the KBI applied for and received two warrants authorizing it to track the GPS location of defendants' phones before asking defendants' wireless provider to ping their phones. The government has presented credible evidence showing that Agent Pipkin submitted an application for warrants to ping Phone 3131 and Phone 8316 to a Shawnee County judge on Saturday afternoon, February 21. The judge signed the requested warrant for Phone 3131 at 4:07 p.m. on that date. He signed a similar warrant authorizing tracking of Phone 8316 four minutes later at 4:11 p.m. Agent Pipkin testified that he sent copies of those warrants to T-Mobile before a T-Mobile representative volunteered that it could begin tracking the phones immediately because of exigent circumstances. Agent Pipkin also testified that he faxed his request citing an exigency after T-Mobile's representative told him the carrier's legal department was not available to review the warrants and thus it could begin pinging immediately only if exigent circumstances existed. *See* Doc. 60 at 242-43. By acquiring warrants and submitting them to T-Mobile before requesting that the wireless provider ping defendants' cell phones, Agent Pipkin satisfied the Kansas warrant statute.

Defendants argue, however, that the "government admits that it did not *use* a warrant or court order to compel T-Mobile to ping defendants' cell phones." Doc. 33 at 7 (emphasis added). Specifically, Ms. Moreno-Magana argues:

> [Agent Pipkin] stated that the legal team for T-Mobile was not there to review any court order because it was the weekend. So any warrant or court order would not have been processed until Monday. ([Doc. 60 at] 242). That is when the T-Mobile phone representative recommended that Agent Pipkin rely on exigent circumstances. ([Doc. 60 at] 243). So law enforcement did not actually use a warrant or court order to ping the phones to obtain the real-time location data. ([Doc. 60 at] 242).

Doc. 65 at 2-3. Defendants' argument thus frames the narrow and, it appears, novel question presented here: Does law enforcement violate Kansas law or an individual's Fourth Amendment rights when it acquires a warrant and provides it to the wireless carrier, but the carrier decides to begin providing the suspect's geo-locating information for a different reason?

This is the question here because, as explained above, the credible evidence shows that Agent Pipkin secured warrants and provided them to T-Mobile before law enforcement received any of the ping results. But the rub is that T-Mobile's representative could not access his company's legal department to assess the warrants' bona fides during the weekend. Presented with this news, Agent Pipkin responded by explaining that waiting until Monday put the KBI's CI at risk. *See* Doc. 58 at 135 ("I told T-Mobile . . . that there was an event going on that if carried out through its entirety would . . . possibly put a person's life in jeopardy."). The T-Mobile representative chose to deem these conditions as "exigent circumstances" that permitted it to provide the locating information without waiting for T-Mobile's legal department to bless the warrants. This is what defendants mean when they argue that the KBI did not "use" a warrant to access their phone's locating information.

None of the parties cite any legal authority that has considered analogous circumstances. The Court has searched, independently, for such a case. It found none. Given the absence of controlling or persuasive precedent, the Court must decide the issue by reviewing the purposes of the Fourth Amendment's warrant requirement and applying it to these unusual circumstances.

### b. Law enforcement complied with the Fourth Amendment's warrant requirement.

The Fourth Amendment provides that the right "against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see also* K.S.A. § 22-2502(a) (requiring a showing of probable cause before the issuance of a search warrant under Kansas law). The fundamental purpose of the Amendment's warrant requirement "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Mun. Court of City and Cnty. of San Francisco*, 387 U.S. 523, 528 (1967). And to that end, "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Id*. at 528-29 (citations omitted). The Supreme Court has explained the reason for the Fourth Amendment's warrant requirement in this fashion:

> The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. . . . And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the [defendant].

*McDonald v. United States*, 335 U.S. 451, 455-56 (1948).

Agent Pipkin's actions here comported with both the purpose and pragmatic requirements of the Fourth Amendment. Specifically, Agent Pipkin presented a sworn warrant application to a disinterested state court judge before contacting T-Mobile. The judge, in turn, reviewed the application, decided that probable cause existed to believe that defendants were transporting methamphetamine, and issued two warrants authorizing the KBI to secure tracking information from the suspects' cell phones "as authorized by state law." Doc. 45-1 at 4. The warrants also ordered "Metro PCS in relation to T-Mobile to cooperate with the [KBI]." *Id.* Agent Pipkin submitted the warrants to T-Mobile's Law Enforcement Relations Group before calling the wireless provider to initiate pings of defendants' phones. And when faced with the provider's inability or unwillingness to review the warrants during a weekend, Agent Pipkin followed T-Mobile's suggestion and made an alternative request for immediate pings because exigent circumstances existed.

Because Agent Pipkin secured warrants and submitted them to the wireless provider before requesting pings, the Court concludes that he complied with the privacy protections afforded defendants under the Fourth Amendment. The Kansas judge, acting as a neutral intermediary, issued the warrants upon a showing of probable cause. Agent Pipkin thus had obtained the judicial authorization demanded by the Fourth Amendment and the Kansas statute before acquiring the locational data on defendants' phones.

Once Agent Pipkin had secured the warrants and submitted them to T-Mobile, the wireless provider's capacity to approve them on a weekend and the provider's justification for initiating pings amounted to private administrative concerns beyond the reach of the Fourth Amendment. To reach a contrary conclusion, as defendants urge the Court to do, would add a new requirement to the Fourth Amendment and the Kansas statute, *i.e.*, under defendants' theory,

law enforcement would have to secure a warrant from a neutral magistrate *and* convince the wireless carrier to agree with the magistrate's determination. Neither source of law will abide such a requirement and the Court thus rejects defendants' argument that law enforcement did not "use" a warrant to secure locating information from T-Mobile.

### 2. Probable cause supports the warrant application.

Alternatively, defendants argue that Agent Pipkin's warrant application was facially deficient because it did not state sufficient facts for the state court judge to find probable cause. Probable cause justifying a search warrant requires "'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Cooper*, 654 F.3d 1104, 1124 (10th Cir. 2011) (quoting *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001)). And "[p]robable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990).

When reviewing the sufficiency of a search warrant application, the Court must "interpret [the application] in a common sense and realistic fashion." *United States v. Grimmett*, 439 F.3d 1263, 1270 (10th Cir. 2006). The Court also "must accord great deference to the probable-cause assessment of the state court judge who issued the warrant." *United States v. Pulliam*, 748 F.3d 967, 971 (10th Cir. 2014) (quotation omitted). And a reviewing court will uphold the issuing magistrate's determination if the supporting affidavits "provide[d] the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239 (1983); *see also United States v. Finnigin*, 113 F.3d 1182, 1185 (10th Cir. 1997) (stating that a reviewing court will uphold a finding of probable cause if the "totality of the

information contained in the affidavit" provides a substantial basis for a probable cause determination).

Where law enforcement bases its affidavit on information from a confidential informant, "the court makes a probable cause determination based on the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge." *United States v. Hendrix*, 664 F.3d 1334, 1338 (10th Cir. 2011) (citing *Gates*, 462 U.S. at 230-31; *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009)). These factors are "intertwined" and "not absolute, independent requirements that must be satisfied in order for probable cause to exist[.]" *Quezada-Enriquez*, 567 F.3d at 1233. And "a deficiency in one factor may be compensated for by a strong showing of another or by other indicia of reliability." *Id*. If the application does not describe the basis for the informant's knowledge, the reviewing court should determine whether the informant provided "'the kind of highly specific or personal details from which one could reasonably infer that the [informant] had firsthand knowledge about the claimed criminal activity.'" *Quezada-Enriquez*, 567 F.3d at 1233 (quoting *United States v. Tuter*, 240 F.3d 1292, 1298 (10th Cir. 2001)).

Mr. Martinez contends that Agent Pipkin's application does not contain sufficient information corroborating the reliability of the CI's information. Specifically, Mr. Martinez argues that the information from the CI deserved little weight because it did not reveal the CI's identity, discuss the CI's "bona fides of reliability," or answer a number of questions Mr. Martinez now poses about Guerro and his operations.[6] Mr. Martinez also argues that the

---

[6]     Mr. Martinez claims that the application failed to establish probable cause because it lacked corroborating details establishing:

> (i) Guerro was a drug trafficker between California and Kansas, (ii) the relationship between [the] CI and Guerro, (iii) why the CI believed that Guerro would deliver drugs to him in November and what the specific deal was, (iv) why it took so long (from

application was deficient because the information about Guerro's attempt to transport methamphetamine to Kansas in November 2014 was stale. The staleness argument is the weakest of defendants' arguments.

Agent Pipkin's application contained sufficient information establishing the CI's reliability, veracity, and a basis for the state court judge to conclude that probable cause existed. At the outset, the application identified the CI as a "reliable" and "long-standing CI who has assisted with multiple Federal and State cases." Doc. 45-1 at 2. It also represented that the CI had given the KBI reliable information about Guerro's intent to transport methamphetamine into Kansas since September 2014. This description provided sufficient grounds for the issuing judge to conclude that the CI was a reliable source of information. *See Quezada-Enriquez*, 567 F.3d at 1233 ("Reliability determinations entail inquiry into whether the informant has provided accurate information in the past.").

The application also revealed that the KBI already had corroborated much of the information that the CI provided during the ongoing investigation of Guerro. Specifically, the application states that the CI provided the KBI with a number of text messages sent by Guerro in November 2014. In those texts, Guerro told the CI that he was transporting a load of methamphetamine from Los Angeles to Topeka. The texts indicated that "Guerro [was] driving in a [g]ray with black top Toyota Solara with CA license plate 7CRS565 and [was] following the load vehicle being driven by two unknown Hispanic males in a [g]rey Ford Ranger with CA

---

November to February) to do a deal that the CI had been speaking with Guerro about doing since September of 2014, and (v) what had happened in the intervening three months from November to February.

Doc. 33 at 17. While details like this might have enhanced the judge's determination, they were not required to show probable cause. *See Gates*, 462 U.S. at 239 ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

license plate 7M45684." Doc. 45-1 at 2 (internal quotation omitted). Acting on the CI's information, the KBI located and stopped Guerro in western Kansas. And, consistent with the CI's tip, the KBI found no methamphetamine in Guerro's car. The application also explained that the CI had learned that the second vehicle containing methamphetamine had diverted to an unknown location once law enforcement intercepted Guerro.

Mr. Martinez contends that this information was stale when Agent Pipkin applied for warrants in February 2015. Generally, "[p]robable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." *United States v. Snow*, 919 F.2d 1458, 1459-60 (10th Cir. 1990) (citing *United States v. Shomo*, 786 F.2d 981, 983 (10th Cir. 1986)). But Mr. Martinez's argument misapprehends the role of the November information. Here, the description of the CI's November 2014 tip demonstrated that the CI was in direct contact with Guerro and had previously provided the KBI with reliable, predictive information about Guerro's efforts to move methamphetamine into Kansas. It also served as background information about the KBI's ongoing investigation of Guerro and provided a basis for the judge to infer that the CI's February 2015 tip about defendants would lead to methamphetamine. *See Shomo*, 786 F.2d at 984 ("[W]here the affidavit recites facts indicating an ongoing, continuous criminal activity, the passage of time becomes less critical."). Thus, the information about the CI's November 2014 tip was not too stale to support the issuing judge's assessment of the CI's reliability and the probable cause finding he made based on the CI's more recent information.

The information leading to the November 2014 stop of Guerro provided a substantial basis to conclude that the CI was reliable, had firsthand knowledge of criminal activity, and previously had provided law enforcement with truthful information about Guerro. *See Quezada-*

*Enriquez*, 567 F.3d at 1233 ("[W]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant.") (internal quotation and citation omitted); *see also Florida v. J.L.*, 529 U.S. 266, 270-71 (2000) (finding that "predictive information" permitting the police to "test the informant's knowledge or credibility" can establish an informant's veracity or basis of knowledge). And, in combination with all of the other facts and assertions in Agent Pipkin's affidavit, this information provided a substantial basis for the state court judge to find that a fair probability existed that the KBI would find methamphetamine with the defendants. *See Finnigin*, 113 F.3d at 1185. The Court thus concludes that Agent Pipkin's affidavit contained sufficient facts for the state court judge to find, under the totality of the circumstances, probable cause to issue warrants authorizing access to information about the location of defendants' phones.[7]

### 3. Even if the application lacks probable cause, Agent Pipkin acted with an objective, good faith belief that the Kansas court properly had issued the warrants.

Even if the Kansas court lacked probable cause to issue warrants, the record demonstrates that Agent Pipkin acted within the good faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897 (1984). In *Leon*, the Supreme Court held that "suppression of

---

[7]     In his Post-Hearing Brief (Doc. 63), Mr. Martinez also contends that probable cause did not support the warrants because the description of the CI's February 20, 2015 communication with Ms. Moreno-Magana recited by Agent Pipkin's application "was inaccurate and misleading." Doc. 63 at 12. To support this argument, Mr. Martinez notes that Ms. Moreno-Magana's cell phone, seized by law enforcement after her arrest, contained no record of a call or text message to the CI at the time listed in the application. But this fact does not defeat probable cause.

Agent Pipkin did not have access to Ms. Moreno-Magana's phone records while preparing the application. His statements, instead, were based on the tip that he received from a reliable CI. Given the totality of the circumstances, the CI's tip was sufficient to support the issuing judge's determination that probable cause existed. *See United States v. Sanchez*, 725 F.3d 1243, 1247 (10th Cir. 2013) ("'[Not] every fact recited in the warrant affidavit [must] necessarily [be] correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily.'" (quoting *Franks v. Delaware*, 438 U.S. 154, 165 (1978)) (brackets in original).

evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." 468 U.S. at 918. "The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 131 S. Ct. 2419, 2426 (2011) (citations omitted). "[T]he exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'" *Herring v. United States*, 555 U.S. 135, 141 (2009) (quoting *Leon*, 468 U.S. at 909). Thus, even "[i]f a warrant is not supported by probable cause, the evidence seized pursuant to the warrant 'need not be suppressed if the executing officer acted with an objective good-faith belief that the warrant was properly issued by a neutral magistrate.'" *United States v. Campbell*, 603 F.3d 1218, 1225 (10th Cir. 2010) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)).

Defendants contend that the good faith exception cannot apply here because the government has conceded that Agent Pipkin did not rely on the warrants issued by the Kansas court to secure the location information from T-Mobile. Defendants point specifically to email correspondence between defense counsel and the government during discovery. In that exchange, Mr. Martinez's counsel requested a copy of Agent Pipkin's application and an explanation why he did not attach the two warrants to a fax requesting T-Mobile to initiate tracking immediately because of exigent circumstances. The government responded: "SA Pipkin didn't use the order, because of exigent circumstances, thus that order is irrelevant." Doc. 35-1. Defendants thus argue that the government did not "in good faith, rely on a warrant as required in [*Leon*], that turned out not to be supported by probable cause; rather it relied on its own judgment without any warrant or exigent circumstances." Doc. 33 at 20.

The government counters that Agent Pipkin acted in good faith, as *Leon* permits. Specifically, it notes that Agent Pipkin received warrants authorizing the KBI to track defendants' phones and sent those warrants to T-Mobile before requesting the carrier ping immediately because of an exigency. The government contends that Agent Pipkin did rely on the warrants before tracking defendants' phones.

The credible evidence establishes that Agent Pipkin received two warrants permitting the KBI to track the GPS location of defendants' cell phones. The government also has adduced credible evidence indicating that the Kansas court issued those warrants and Agent Pipkin submitted them to T-Mobile before pinging began. Agent Pipkin also testified that he faxed his ping request citing exigent circumstances only after a T-Mobile representative told him that the carrier could commence pinging during the weekend only if he referred to exigent circumstances. Specifically, Agent Pipkin testified, in relevant part, as follows:

> Q.      Okay.  Now, simultaneously with you contacting T-Mobile[,] a warrant is obtained from a state district court judge, correct?
>
> A.      Yes.
>
> . . . .
>
> Q.      Okay.  Why do both?
>
> A.      Past practice and what I was told, because I have not done many pings in my career, is that you need an affidavit for that signed by a judge.  So[,] I went ahead and did that.  It was on a weekend. . . .  I eventually got ahold of T-Mobile to actually speak to [a] person. . . .  I gave them what I had.  I had said I have an affidavit.  They then asked me a couple other questions and the exigency came up. I then explained what I had.  *The individual I was then speaking with [at T-Mobile] said, well, that is exigent circumstances.  You don't need an affidavit for exigent circumstances.  We can just turn it on immediately*.  And I said that's great.  *I had already faxed the affidavit prior to that.*
>
> Q.      To who?
>
> A.      To T-Mobile.

Q.      Okay.  So the warrant was in existence and served but there's no return on it.  Why is that?  You never did a return of service on that warrant even though you faxed it to T-Mobile?

A.      I can't answer that.  Don't know.

Doc. 58 at 139-41 (emphasis added).

Based on this testimony, the Court finds that Agent Pipkin relied, in good faith, on the two warrants issued by the state court judge.  While it is true that the government's counsel stated in an email that Agent Pipkin did not use the warrants and "thus [those] order[s] are irrelevant," Doc. 35-1, the Court does not understand that message to concede that Agent Pipkin lacked good faith—particularly in light of the government's assertion of good faith in its response (Doc. 45).  Instead, the record shows that Agent Pipkin procured and provided T-Mobile with the judge's warrants before ever requesting T-Mobile track defendants' phones because of exigent circumstances.  And, while T-Mobile may not view the warrants as the reason it began pinging defendants' phones, its internal rationale does not nullify Agent Pipkin's compliance with the Fourth Amendment or the Kansas statute.  Nor does it nullify his good faith reliance on the state court warrants authorizing KBI tracking of defendants' phones.  *See Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" (quoting *Leon*, 468 U.S. at 922-23)).  Thus, even if one could not find probable cause in Agent Pipkin's application—a proposition that the Court has rejected—the good faith exception to the exclusionary rule applies and precludes suppression of the evidence derived from pinging defendants' cell phones.  *See Tuter*, 240 F.3d at 1298-99 ("Where an officer acting with

objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter.") (internal quotations omitted).

### 4. The warrants issued by the Kansas state court were not void *ab initio*.

Defendants contend that the warrants issued by the Kansas state court are invalid because that court lacked jurisdiction to authorize a search of defendants' phones while they were outside Kansas.[8] The first pings provided by T-Mobile placed defendants' cell phones in Colorado when pinging began and, by implication, when the Kansas judge issued the warrants. Defendants assert that the Kansas court's warrants thus were "void *ab initio*" under both Kansas and federal law. This fact, defendants contend, means the Court must suppress all evidence discovered during the search of defendants' vehicle because the warrants were void from the moment they were issued.

The government acknowledges that a Kansas state court cannot issue warrants authorizing a search of property located outside of Kansas. The government argues, however, that this general rule does not apply here. Instead, it contends that the warrants in this case are valid because the Kansas judge did not intend "to exceed his authority under Kansas law when he signed" them. Doc. 64 at 12. To support this position, the government notes that: (1) Agent Pipkin's application and the Kansas court's warrants did not "expressly authorize the search of property outside of Kansas;" (2) Agent Pipkin's application for the warrants informed the Kansas

---

[8] Defendants raise this issue for the first time in their Replies. *See* Doc. 52; Doc. 53. Generally, courts in this District refuse to consider arguments raised for the first time in a reply brief. *See, e.g., United States v. Martin*, No. 10-2342-JWL, 2010 WL 4340467, at *3 (D. Kan. Oct. 27, 2010) ("Because [defendant's] arguments were first addressed in the reply brief, they are waived and not properly before this court.") (citation omitted). This rule exists because a movant's reply brief is usually the final pleading before the matter is submitted to the court for decision. The opposing party thus cannot respond to new argument advanced in a reply. Here, the Court granted all parties the opportunity to file additional briefing after concluding the second evidentiary hearing on defendants' motions. All of the parties filed a post-hearing brief and all parties, including the government, addressed defendants' jurisdictional argument. Because all parties have addressed this issue, the Court considers defendants' new argument.

court that law enforcement did not yet know defendants' location, stating only that they "were on the road bound for Topeka;" and (3) the warrants did not authorize pings of defendants' phones while they were outside Kansas. Doc. 64 at 12. According to the government, "the collection of data from Colorado was never expressly ordered; rather T-Mobile provided [that] information based on [that company's] determination that an exigency existed." *Id*. at 14.

Defendants' jurisdictional argument implicates the territorial restrictions of K.S.A. 22-2503. That provision permits a Kansas district court judge to issue search warrants for persons or property located in Kansas. *See State v. Englund*, 329 P.3d 502, 510 (Kan. Ct. App. 2014). Because defendants' phones happened to be located in Colorado when the Kansas district judge issued the warrants and T-Mobile first pinged their phones, defendants contend that the warrants were "void *ab initio*" and thus all of law enforcement's search of the phones' data violated their Fourth Amendment rights.

"'It is, however, well established in this circuit that in federal prosecutions the test for reasonableness in relation to the Fourth Amendment protected rights must be determined by Federal law even though the police actions are those of state police officers.'" *United States v. Green*, 178 F.3d 1099, 1105 (10th Cir. 1999) (quoting *United States v. Le*, 173 F.3d 1258, 1264 (10th Cir. 1999) (further quotations omitted)). This is so because "'the exclusionary rule is only concerned with deterring [federal] Constitutional violations.'" *Id*. (quoting *Le*, 173 F.3d at 1264) (bracket in original). "Thus, 'the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended.'" *Id*. (quoting *Le*, 173 F.3d at 1264); *see also United States v. Price*, 75 F.3d 1440, 1443-44 (10th Cir. 1996) ("The authority in a federal case for suppressing evidence due to an unlawful search is the Fourth Amendment to the Federal Constitution. A violation of state law

may or may not form the basis for suppression on Fourth Amendment grounds.") (citations omitted).[9]

The constitutional standards for evaluating the validity of a search warrant are well established: The Fourth Amendment requires that a "warrant contain 'probable cause supported by an oath or affirmation and a particular description of the place, persons and things to be searched or seized.'" *Green*, 178 F.3d at 1106 (quoting *United States v. Wicks*, 995 F.2d 964, 972 (10th Cir. 1993)). As discussed above, the warrants issued by the Kansas court clear this constitutional hurdle. Thus, the Court, applying federal law, must determine (1) whether the Kansas court could issue warrants permitting the KBI to ping defendants' phones, and (2) if not, whether the exclusionary rule requires suppression. The Court answers these questions in the paragraphs below.

Finally, defendants also assert that the state court warrants are invalid because the Kansas court issued them in violation of Fed. R. Crim. P. 41(b), the federal analogue of K.S.A. § 22-2503. Rule 41(b), in relevant part, provides:

> At the request of a federal law enforcement officer or an attorney for the government:
>
> (1) a magistrate judge with authority in the district—or if none is reasonably available, a judge of a state court of record in the district—has authority to issue a warrant to search for and seize a person or property located within the district;

---

[9]     As a matter of public policy, Congress or a state legislature may decide to enhance the protections arising under the Fourth Amendment. Indeed, Congress did so when it passed Title III of the Omnibus Crime Control and Safe Streets Act. *See* 18 U.S.C § 2518(10)(a) (statutorily mandating suppression when law enforcement intercepts "any wire or oral communications . . . or evidence derived therefrom on the grounds that . . . the communication was unlawfully intercepted . . . or the interception was not made in conformity with the order of authorization"). The Kansas Legislature followed suit when it enacted the Kansas analogue of this provision. *See* K.S.A. § 22-2516(9)(a) (same). But this statute-based suppression remedy does not extend to all information collected from a suspect's wireless device, *see United States v. Banks*, No. 13-CR-40060-DDC, 2014 WL 4261344 at *2 (D. Kan. Aug. 29, 2014) (differentiating between "wire or oral communication[s]" and other forms of "electronic communication[s]"), and it does not reach the locating information that was intercepted here.

> (2) a magistrate with authority in the district has authority to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed[.]

Fed. R. Civ. P. 41(b). Defendants contend that the warrants issued by the Kanas court were void *ab initio* under Rule 41(b) because the court issued them and law enforcement executed them while defendants' phones were outside Kansas. To support this proposition, defendants cite *United States v. Krueger* (*Kruger I*), 998 F. Supp. 2d 1032 (D. Kan. 2014), *aff'd*, — F.3d —, No. 14-3035, 2015 WL 7783682 (10th Cir. Nov. 10, 2015).

In *Krueger I*, Judge Belot examined the validity of a warrant issued by a Kansas federal magistrate judge. *Id*. The warrant permitted law enforcement to search and seize property located in Oklahoma. *Id*. at 1034. Because the magistrate judge had authorized the search and seizure of property that he knew was outside his statutory jurisdiction, Judge Belot held that the magistrate's warrant was void *ab initio*. *Id*. at 1034-35 ("Moore told the magistrate that defendant and his computer were in Oklahoma. The warrant specified that the Oklahoma residence was only to be searched for defendant's property."). Judge Belot then considered whether the fruits of a search warrant that violates Rule 41(b) on its face required suppression, stating:

> The Tenth Circuit has held that "unless there is a clear constitutional violation, non-compliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the rule."

*Id*. at 1035-36 (quoting *United States v. Rome*, 809 F.2d 665, 669 (10th Cir. 1987)).

Judge Belot determined that suppression was warranted in *Krueger I* because the defendant had shown prejudice—*i.e.*, the magistrate could not have issued a warrant for property he knew was outside his jurisdiction "if Rule 41(b)(2) 'had been followed to the letter.'" *Id*. at

1036 (quoting *Rome*, 809 F.2d at 670). On appeal, the Tenth Circuit affirmed, stating that the magistrate "surely would not have issued" the warrant had he recognized that he "clearly lacked Rule 41 authority to issue a warrant for property already located in Oklahoma." *United States v. Krueger* (*Krueger II*), — F.3d —, No. 14-3035, 2015 WL 7783682, at *5 (10th Cir. Nov. 10, 2015).

The difference here is that neither Agent Pipkin nor the Kansas state court judge knew the location of defendants' phones before the warrants authorized pinging to begin. *See* Doc. 45-1 at 4 ("Only by the ping order would Agents know the location of the vehicle."). Agent Pipkin knew only what his CI had told him: that the defendants had left Los Angeles around 8:00 p.m. on February 20 en route to Topeka. *See id.* at 3. Agent Pipkin included this information in his warrant application. This difference is material from the facts present in *Krueger I*. There, both law enforcement and the issuing magistrate knew the location of the target property, and the search warrant, on its face, permitted agents to search and seize property beyond the magistrate's jurisdiction. *See Krueger I*, 998 F. Supp. 2d at 1034.

The warrants here did not authorize pinging of phones that the issuing judge knew to be located outside Kansas. Instead, the warrants stated expressly that the Kansas court had issued them "under the authority granted" by the Kansas rules of criminal procedure. Doc. 45-1 at 4 (referencing "K.S.A. Chapter 22, Article 25 and Article 46"). The Kansas court also directed T-Mobile to ping defendants' location only "as authorized by state law." *Id.* But T-Mobile did not follow this directive. Instead, it began pinging the phones immediately and began providing this information to Agent Pipkin even though the warrants did not direct T-Mobile to do so. T-Mobile's actions did not void the warrants which, by their terms, confined themselves to the boundaries of the state of Kansas.

28

Finally, and even if T-Mobile's pinging of the phones while located outside Kansas exceeded the state court judge's statutory authority, this defect does not nullify the validity of all ping results. Defendants do not challenge the issuing judge's authority to order pinging of phones located in Kansas. The balance of evidence establishes that law enforcement relied on Kansas pings to find the Traverse in Geary County, Kansas, and execute the traffic stop that allegedly led to discovery of the contraband.

> **5. The Court need not determine whether exigent circumstances existed or whether the observed traffic violations were an independent source of evidence.**

Because it has held that Agent Pipkin obtained and relied on warrants authorizing the pings of defendants' phones, the Court need not determine whether exigent circumstances existed under Kansas law. Nor does the Court decide whether the traffic violations alleged by Lt. Stopper supplied an independent, constitutional basis to stop defendants sufficient to satisfy the independent source doctrine.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motions to suppress (Docs. 33, 34) are denied.

**IT IS FURTHER ORDERED THAT** defendant Martinez's Motion to Strike Document 54 (Doc. 55) is granted.

**IT IS SO ORDERED.**

**Dated this 3rd day of February, 2016, at Topeka, Kansas.**


**s/ Daniel D. Crabtree_____**
**Daniel D. Crabtree**
**United States District Judge**